I just want to make sure you have 9 minutes for your main argument and 6 for rebuttal. Is that correct? That's correct, Your Honor. Okay. You can start whenever you're ready. Thank you. May it please the Court. Counsel. As indicated, I'm Tom McGough, representing the appellant, Prossack, the lead in Respironics. At issue in our appeal in this patent case are several claim constructions and the entry of summary judgment on one of the two devices considered by the court below, the commercial device that was actually commercialized. Since the trial court issued its summary judgment on the commercial device, we had a jury trial on the trade show device, and it was a determination by the jury that, in fact, the trade show device did infringe. Let me turn... And I'm correct. That's a single line. There wasn't a sale. It was just that it was shown. It was shown and demonstrated and used at the trade show. But it's a one-off. Correct, Your Honor. You guys mitigated over one of it. We did, in part, Your Honor, because it was the only way we could get here. We asked the court to sever that and to certify the purpose of the case. But that is on the right here. The first claim I'd like to address is the term selected higher and lower pressure magnitudes. And as I'm sure the court will recall, these are sleep apnea devices that deliver pressurized air into a mask for the purpose of treatment of sleep apnea. And the patents deal with different pressures being sent to the mask for inspiration and for expiration, how to know when the patient is inhaling versus exhaling so that the switch can be made, and how to calculate the unloading pressure, which is the drop in pressure that takes place at expiration. The district court held that selected higher and lower pressure magnitudes really meant pre-selected higher and lower pressure magnitudes. More specifically, that the lower pressure magnitude had to be selected under the patents in which this term applied at a time prior to the operation of the software that measured the inspiration. In other words, it had to be selected by the individual before he or she goes to bed at night and puts the mask on. It wasn't quite that specific. It was really not who selected it, but when it was selected. The dial has to be set. Well, in the preferred embodiment, there were dials, one for the inspirational pressure and one for the expiration pressure. But the court didn't focus on who did the selection. The selection can be done by a physician. It can be done by the patient. It can be done by software. What the court focused on was when that selection had to take place. It had to be selected before, it has to be done before the mask is on the face and the inhaling, exhaling sleep process is in progress, right? Technically, what the court held is it had to be selected before the operation of the software that chose the unloading pressure. And the software operates when the mask is on and the person is sleeping or trying to sleep, right? Well, as we said in the briefing, the software operates the moment you turn it on. I've got a question about, sir, what is your strongest evidence in the patent here in 1-9-3 in the specification or in the claim that supports your view here? The strongest evidence is the language of the claim itself, which it should be, Your Honor. The way the district court got off the track was it misinterpreted the claim. The claim, okay. Claim three, patient had to select it. All right. We're in the 802 patent, claim three, the method of medical treatment for a patient comprising the steps of. Now, here's where the district court went off track. It construed the next four things as a sequential set of steps that you did one, the providing part. Then you did detecting. Then you did processing. Then you did utilizing. And because it said selected is in the first step, and it is supposedly in the past tense, technically it's an adjective, not a verb, that therefore the selection had to take place before the next three steps. But in fact, the structure of that claim is really quite different. The first leg of it is providing a flow of breathing gas, which is done continuously throughout the night. That's what the device does. It provides a flow of breathing gas for delivery to the patient. And then while it's doing that, continuously while it's doing that, it does the next three steps sort of in a loop. That is, continually detecting, continually processing, and then utilizing the results of that processing. So the district court essentially treated that as if it said, all right, first you provide, then you detect, then you process, then you utilize. Is there anything in the written description of the 802 patent that suggests any other way to select these pressure magnitudes other than to adjust those dials and pre-select, if you will? That is the preferred embodiment. I realize this is the preferred embodiment, but my question is, is there anything that suggests anything else? No, but there's nothing that suggests it can't be done. It doesn't say when in the process that selection has to take place. Wait just a second. I think the question that Judge Lynn was asking the same way I am, which is, is there any, I understand your argument based on the language of the claim. The question is, is there any support in the spec for that interpretation? Then I deserve you to say no. You've heard me say no, but there's no indication to specify. It doesn't teach against it. It doesn't exclude the preferred embodiment. I'm sorry. The preferred embodiment teaches against it. But that's pretty good teaching. But as the court is aware, you should not, this court doesn't limit the claim to the preferred embodiment. If the specification provides support for a broader interpretation. Your Honor, if the specification, the plain wording of the claim doesn't say, doesn't indicate that the selection has to take place before the software operates. You go to the specification, and it talks in terms of dials. Now, for example, if the patient were to change the dials, put the mask on, start the machine on, and they made the machine so that the patient decided, well, that's a little bit too much annoying pressure. I'll click the dial, a dot. That would infringe under the district court's interpretation. And certainly that would be within the, what a, someone skilled in the trade would understand you could do with dials. But as I understood the district court's claim construction, the court concluded that in the operation of this device, that the selection of the higher and lower pressures would be done prior to the time that the device was placed in use, whether it's at the beginning before you go to sleep, or whether it's in the middle of the night and you wake up and you change it. Either way, the higher and lower pressures are selected, and then the device is used to take advantage of those preselections. That is what the district court found. And certainly that's what the preferred embodiment discloses. Correct. But it's not enough to suggest that the claim says it without any other support.  And one, that the preferred embodiment shows dials, and the preferred embodiment talks about those being preset. But let me move to this tome. Tome 3802, sir. Tome 3802 at lines 24 and on. In general, when the instantaneous flow exceeds average elevations and hailing of the signal supplies and pressure control sets, the person will deliver at a preselected elevated pressure. Correct. And that's the higher pressure. It doesn't say that about the lower pressure, which is the one that is at issue here. If anything, again, it doesn't say when the lower pressure must be selected. It talks about the higher pressure being preselected, but not the lower pressure. Perhaps more importantly, Your Honors, as we point out, summary judgment was inappropriate on this, because even given the district court's interpretation, the accused device doesn't, the lower pressure doesn't change. It is locked in, essentially, at the time the machine is turned on. Now, the trade show device was different. The trade show device actually did react, as best we can tell. We didn't get a chance to test it. It actually did react on a breath-by-breath basis. But the device here, the evidence is virtually uncontested, that for all the testing within normal limits, when you turned it on, because they had dampened the effect, we believe, to avoid, to try to get around the trade show problems, they dampened the effect to the point where the lower pressure was constant, regardless of the soft X setting, regardless of the soft X setting. Once the machine started, it didn't change, regardless of the patient's breathing. And so, therefore, it infringes even under the district court's interpretation, or at a minimum, there's an issue of fact on that. Now, the district court looked at the charts that we supplied in that regard. We believe the only interpretation for its conclusion was that it was looking at the wrong charts. In fact, Mr. Mascara's charts, which begin in the appendix at page 2051, really do clearly show in the far right-hand column that the delivered pressure, what comes out of all the equations, is the same regardless of the soft X setting and regardless of delta V. So that how important is this different chart issue to your case? Well, it's the difference between summary judgment and an issue of fact. Did you bring this chart error to the district court's attention? We briefed it in coming into the summary judgment. The district court ruled against us, and we believe erroneously looked at the wrong set of charts. Did you bring it to the trial judge's attention? Your Honor, you made a ruling that's based on reading the wrong chart. Did we make a motion for reconsideration or re-argument? No, Your Honor, we did not. I stand in my rebuttal. Your Honor, I'd like to reserve, if I could, unless there are questions that you'd like to address. We'll give you your full re-argument. We'll select a new term, I guess. We'll give you your full six months. Thank you. Mr. Lyon? Addressing the selected higher oral pressure. Before I get started, can I just ask you a question about your cross-appeal? Yes, sir. This is in your brief on page 1. Cross-appeals A and B, where you're giving the second round for non-imprisonment. You're supporting the judgment with an alternative argument. A and B, the first two issues in your cross-appeal. Yes, Your Honor. You're supporting the judgment with different arguments? No. What we're doing with the different arguments there is showing that there is disclaimer and it does support. That's because you're not enlarging the judgment. No. That's not a proper cross-appeal. No, we're not. That's not a proper cross-appeal. Unless you're trying to enlarge the judgment or alter the judgment of non-imprisonment, it's not a proper cross-appeal. What we're doing there is showing that there is disclaimer under. I don't care what you're trying to show. It's another argument to support non-infringement, right? It is an argument with respect to 112th paragraph. It's an argument with respect to the Markman hearing and a decision. But is it changing the scope of the judgment? The judgment was one of non-infringement, correct? Yes, that's right, for the commercial products. And you're not trying to change that judgment? There's also— I don't know what you mean by that. When you go back to your firm and you get somebody who understands that the Federal Rules of Civil Procedure and ask them whether this is a proper cross-appeal, because it's not. With respect to— On these two issues. With respect to the disclaimer, it would also apply to the finding of infringement of the 517 patent on the med trade device. So— But it's not so limited. You're talking—point A is on the early patents. Yes, point A is— I don't mean to fuss with you too much about it, but we constantly have people come in here and file cross-appeals. And what the cross-appeal lets you do is file an imprisonment, right? You get the last word. Plus the fact that you require someone to have to use up space in their reply to deal with the cross-appeal. And so we've been—we've even suggested sanctioning parties who file improper cross-appeals. Let me end and let you go on when you're ready. Okay. With respect to the selected higher and lower pressures, the claims definitely define the actual temporal sequence of what happens. After the gas is flowing. After the gas is flowing, but that gas is flowing— How does the gas flow? Does it switch or does it just flow in the air? It flows through the tube, but it flows as a result of the higher— Having been turned on, right? Excuse me, sir. Having been turned on. A machine will be turned on, but there is a selection prior to the gas flowing of being higher and lower. Does the claim say selecting higher and lower magnitudes before providing a flow of gas? It says selected in past tense. The answer is no, it doesn't say what it says. What I'd like you to do is to respond directly to your adversary's argument that if you simply read the claim, the claim says, fire up the machine, get the gas going, right? Get the gas going. So the gas is going at a selected rate, right? I think the claim specifically defines the sequence because it defines— The higher and lower pressures are selected. So when they are delivered, they are delivered at the selected past tense pressures of higher and lower. Then the process steps take place on the pressurized air that's flowing at the higher and lower pressure. And then the final step is utilizing the— There's a bunch of algorithms in it. And the algorithms were triggered to produce a selected higher and lower pressure after receiving the first breath of the analyst. I don't think that is the case here. I'm just asking, you'd have a method for treating this problem. You'd have a flow of gas going to the person. Flow of gas would initiate a response of some sort by the patient. And then you would trigger selected higher and lower pressure magnitudes. Because the last step of the claim requires that utilizing step of picking either the higher or the lower pressure depends upon the initial selected and past tense. In other words, that said limitation in the last element is referring back to what has already been picked as the higher and lower pressure, or chosen as the higher and lower pressure. Well, I realize it's referring back to something that's already been picked. But the point of contention is, when was it picked? Was it picked before the machine was turned on? Or was it picked sometime after the machine was turned on? But it was clearly preselected. It was picked when those dials were set. And I believe those dials were set before that machine starts. Assume for purposes of argument, I took the diagram that shows the dial, the preferred volume. I took it out of the packet. Just got some scissors and cut it out and gone. Then what would be your strongest argument based on the specification, that your judgment of preselection before initiation of the machine? Well, from the specification, there's an indication that guidance to a column is in line with the other source. I'm assuming for purposes of argument that that preferred volume is out of the packet, and I'm looking for what in respect supports your interpretation. I'm going to refer the report to the bottom of column 2, top of column 3, where it indicates more specifically a flow generator and an adjustable pressure controller supply air flow at a predetermined adjustable pressure to the airway of the basin through a flow transducer. It's talking about predetermined flow. But predetermined before the machine is turned on? That's what I'm trying to get at. I mean, I don't think your adversary is hiding the notion of predetermination. His formula creates a basis. But he's fighting the district court's interpretation that the preselection, especially of the lower rate, has to be made before the machine is turned off. And I'll grant you that the drawing that shows the switches is very strong evidence in support of your case. I'll grant you that. All I'm trying to do for purposes of analysis for us is to assume that we've removed the preferred environment from the packet. And then we're looking at the patent and trying to say, does the patent have the meaning you suggest, or could it have a broader meaning saying preselection could occur after the machine is turned on? I don't think it can have a broader meaning because it doesn't teach anything in here other than the preferred environment answer to Judge Lin's question. It's strictly setting those dials. Right. But if the written description is neutral, let's assume you have a broad claim. The claim could be read, be covered, as broad as your adversary wants it to be. But our canon of claim construction would give you that broad claim unless you have good reason to find an error about what you find in the spec. And what I'm asking you for is, other than the preferred environment, what in the spec supports your interpretation? I have a whole story for the court there. Column 8. Okay. Where it says, when instantaneous flow exceeds- After you read the line, please. Okay. Line 7. What does it say? When instantaneous flow exceeds the average flow, the patient is inhaling, and in response to the pressure of the gas flowing to the patient, is set at a selected positive pressure. And then, again, it says the same thing, selected positive pressure in the inhalation. So these things are selected. They're preselected. And it follows. Turning for a minute to the- The discussion on column 8 is with respect to the disclosed environment or with respect to the invention? It's in the context of the preferred environment. So that doesn't necessarily help us in interpreting the scope of the invention? The scope of the invention, when all is given is the preferred environment and nothing else is the guide to how things should be interpreted. Turning for a moment to the non-infringement- show machines or something that had preselected higher and lower rates? In the prosecution history, the claims were just- they initially had alternately higher and lower pressures. That claim was rejected under the Ernst patent. What I'm trying to get at, and maybe it's my failure of my homework, but I'm trying to get at whether there was something in the prior art that showed a device that was used for sleep apnea where you have a higher and a lower setting that you would make before you turn the machine on. If that were true and there were such prior art, then it would be hard to believe that this invention isn't some improvement over that, which might include a preselection after the machine was turned on. I'm not aware of that prior art. Turning to the non-infringement for a second. Before you do that, I'd like to ask you to address the motion for summary judgment of non-anticipation and your cross-appeal on that point. It seems to me you've made an argument that has some appeal in that you've directed our attention to some claim charts that show this Yunus article. Is that how it's pronounced? Yunus article. The Yunus article that go element by element, line by line, limitation by limitation in the claim. And from what I gather as a record, the only evidence submitted to counter that argument was an argument that attempted to distinguish the Yunus article on three points that were not in the claim. So I can remember many, many years ago arguing with examiners at the patent office about how the client's claims were patently distinct because the reference doesn't show this, this, and this. And the examiner would come back and say, those are great arguments, except those are things not in the claim. Don't we have the same situation here? I realize I'm sort of arguing your case, but it seems to me that there's some merit to that, and I'd like you to address it that way. Perhaps your adversary can comment in rebuttal. I agree totally with Your Honor. What they relied upon was excerpts from Dr. Yunus's expert report, and the two things they relied upon is allegedly that the Yunus article did not show the treatment of a particular illness. That's not defined in the claim. And they relied upon the statement that there is no flow detection or comparison. That's not in the claim. Contrast that to an element-by-element analysis of anticipation by an expert that was never looked at specifically by the court, instead just sort of relied upon presumption of validity. Respironics never said this element of the Yunus, or this element of the claim is not shown in the Yunus article because. That was never done. It was just this generic kind of a statement. Mr. Bland, the short judgment going, for instance, Claim 21-43 and 44-575 went off on the trial court's interpretation of the shape. Yes, Your Honor. And your adversary argues in the brief that the shape limitation was misinterpreted by the trial judge. That's the argument, and I think that's wrong based upon the intrinsic evidence. Well, the accused device. I think the argument's wrong, sorry. Doesn't the accused device set the lower parameter by reference to the patient? The accused device sets the lower parameter by delta V, which is what's happening in inspiration based upon pressure monitor versus pressure detector. So what you have is a shape of a predetermined pressure profile, right? Now, if that predetermined pressure profile in any instance is going to have magnitude and duration, isn't it? It's going to have magnitude and duration. It has to have at least that. That's correct. And that's just something else?  The trial judge thought shape was limited to magnitude and duration. I think the trial judge was reading the predetermined pressure profile where the shape is set independently. That's happening in the predetermined pressure profile, already there, predetermined, and the shape has been set, and then looked at their argument that magnitude and duration could vary. And when you look at the prosecution history in particular, you escape a summary judgment infringement because your device reads off of the patient for at least one of the parameters, correct? That's correct. So your argument would be, I assume, you don't really care what the full nature of the shape of a predetermined pressure profile is because so long as it has duration and magnitude in it, you've got duration and magnitude measured with respect to the patient in at least one iteration. That is correct, Your Honor. Thank you. And I'll return to non-infringement of the 802 patent. I raise that because it is a concern and I know it's in favor of you. Your adversary is reserved about six minutes for a roll-in, and sometimes that's sort of designed to be a trapping algorithm. But he knows he can't read anything in that six minutes that you haven't talked to him, because it would be improper and unrecoverable. With respect to the non-infringement of the original 802 patent, where it talks about selective higher moral pressure, I would like to read some quotations. He said the moral pressure never varied in the accused device. Their own expert, Dr. Eunice, at page 81244, who did many, many tests on these devices, stated that the magnitude of unloading is a function of gain setting. The peak inspiratory flow of the preceding inspiration, which is a patient-determined quantity. At 1233, Dr. Eunice also stated that these observations demonstrate that the magnitude of unloading is related to the preceding peak inspiratory flow, and that, again, shows that there is variation in the unloading. The Eunice, or the Mascara testability that was referred to by my adversary, relates to just looking at the equation and doing calculations. It's not the actual flow rate. That's what Dr. Eunice was looking at. And then he went on to say, even if that was right, because we can test it's not right, there would be infringement. Well, there's not infringement, because that calculation that's performed is done and is achieved after the selection process. In other words, in accordance with the construction of the claims, the predetermined pressure profile has to be chosen before the software works. The software is working... The amount of gas that goes in on exhalation in your product is determined on the plot, right? That is correct. I'd like to turn to... You're going to have about, what my plan was to make it even, I think you get an extra three minutes, so you have about... You're at 1.48 of that three minutes now. That will mean each side will have 18 minutes. Thank you. So you've got about a minute more. Okay, with respect to the... The selected higher moral pressures, again, and Mr. Mascara. Mr. Mascara is not an expert in this art. He's only a computer expert. He doesn't know obstructive sleep apnea. He's not familiar with... Was he offered as an expert in this? He was offered as a software expert, yes. Not on the basis of software, but certainly on the basis that he was not an expert in these other areas. And when you say challenge, that was put forth in the briefs. Mr. Mascara never appeared at trial as an expert. So we laid out to the court that he was not an expert. Plus, his declarations keep changing along the time. Mr. McGuff talked about the so-called confusion in looking at the wrong charts. Well, all the opinions that were offered with respect to those charts were two. One, that there was a drop in pressure from CPAP with the use of this formula. And two, by the variations, if you varied numbers within the formulas, you could come up with different results. Okay, thank you. Thank you, Mr. O'Brien. I think I gave you a little bit more time while you were arranging your papers. But I think time is of the equal. We'll hear from Mr. McGuff now. And when you're up here, if you could please, whatever else you're going to say, if you could address Judge Clevenger's question with respect to the shape limitations as it relates to the later patent. And Judge Lynn's question with respect to the grant of summary judgment of non-invalidity, the anticipation issue. I'll go first with Judge Clevenger and then to Judge Lynn. On the shape, we believe that shape clearly means something different, or at least in addition to dimension, to magnitude and duration. But that is far too limiting a definition of the word. Well, what that gets us to, it would get us protection from a device that varied the magnitude of the breath, of the expiratory pressure, without varying the shape, that is. If the variation was done of whatever shape or contour because of a receiving breath from the patient, then who cared? Well, if you don't vary it, you can vary the magnitude without varying the shape. That's right. Whatever shape is, it has to be determined without reference to the patient. Correct. And in the accused device, an element of shape is determined with reference to the patient. What I want to go back to, you can't have the same shape but have different magnitudes. That doesn't bother me. What I'm holding in on is part of the limitation of the claim that says whatever shape is, round, square, oblong, whatever it is, it has to be ascertained without reference to the patient. Correct. And whatever their shape is, bathtub, whatever it is, part of it at least is determined with reference to the patient. Which brings me to the second point, and that's back to the masteric charts. And that is, it isn't. Their shape in the commercial, their magnitude in the commercial device does not vary. Now, Mr. Lyons says that Dr. Yunus talked about how delta V changes on load pressure. And that's technically correct as far as it goes. That is, if you look at the formula that Dr. Yunus was looking at, if delta V changes, unload pressure changes. But what then happens, what they did to the commercial device, was they added an additional function. And they dampened the result of that unloading equation so that unload pressure no longer equals the pressure that comes out of the machine on exhalation. They dampened it to the point, and the spreadsheets are, as I said, page 2051 of the record. There are ten columns in that spreadsheet. The right-hand column is the one that matters. That's the one that shows how all the arithmetic works at different soft X settings. And what it shows, if you look down that chart, is that for every soft X setting and every different delta V, the actual result of all the math is the same. It's the same unload pressure. It doesn't vary. The machine is designed to work that way. Now, the unload equation result is somewhere in the middle of that chart. It's column 5, the intermediate calculation. And, yes, that number changes. But that's not the number that determines what pressure the machine delivers, because that's collared by what is column 8, that basically says, if the number is less than 4, make it 4. And if it's greater than this number, make it that number. So, in practice, the way they've set up this software for the commercial device is, regardless of what you do with the soft X guy, and regardless of what delta V is doing, you get the same unload pressure. So, in that sense, even under the district court's interpretation of shape, and even under the district court's interpretation of preselection, if you will, summary judgment was inappropriate. There was at least an issue of fact on that. Now, they attacked Mr. Mascara's opinion by saying that it came late. Well, everybody offered supplemental affidavits of experts after the claim of construction was done. Now, if you want to turn to the... I will. ...Lenz issue, first question. Yes, sir. Now... Now, let me get right to the case. What limitation on 21 of the 575 patent is missing on the analysis part? Well, to answer your question directly, that is, it is the... If you go to 809 and 810 of the record, where it talks about in accordance with a predetermined pressure profile during said expiratory phase, and you look at the chart to look at what they do here, that would be the element that we suggest is missing from the Eunice article. And indeed, Dr. Eunice said that his article did not anticipate this claim. But more importantly, you need to understand what they've done here. We came to the court with... They cited the Eunice article as a prior article. It had been presented to the PTO, and the PTO had said that it had granted the patent over that prior article. They then came to the district court. As the district court explained, all they really did was presented a chart here that appears in page 809 and 810 of the record, where they take the claim elements, and then they put their characterization of the Eunice article, their characterization of the Eunice article, in little boxes. And they say, that's enough. We've not created an issue of fact. The district court said, no, it isn't. But the district court never really explained why that was not correct. It did not go element by element through the chart. Because what it said was, look, you can't just put a chart in front of me. Indeed, the district court never even saw or couldn't find the orth expert opinion that supposedly did this. But you can't just put a chart in front of me that says, here's what the claim is, and that's anticipated. Particularly where the burden on you is to prove by clear and convincing evidence that, in fact, there was anticipation. And so it said, what plaintiff is really doing is trying to shift over the burden of proof. What they're really saying is, make the plaintiffs prove that it's not anticipated, and ignore the clear and convincing burden that is on us. That, essentially, was the basis for the district court's findings. Thank you, Mr. McBride. Thank you. Mr. McBride, I did reserve a minute for the rebuttal very quickly. But again, you just confided the anticipation issue. Well, okay. With respect to the anticipation issue, that's right. And they never gave a reason why the Unis article did not anticipate those claims. Nothing was pointed out to that effect. It was clear that, in fact— I thought your adversary just said a minute ago that Unis testified that he didn't think it anticipated. He testified. In his expert report, he stated it doesn't have anything about what it's used for or full compensation or full leakage. And neither of those things are in the claim. So what he said has nothing whatsoever to do with the claim or with the Unis claim. Thank you. Thank you, Mr. Lyons. Mr. McGough, thank you. Case is submitted. That concludes today's hearing. All rise.